T.C. Memo. 2011-288

UNITED STATES TAX COURT

HOLLY WALDRON a.k.a. HOLLY HOPS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

HOLLY B. HOPS a.k.a. HOLLY B. WALDRON, Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket Nos. 14440-09, 24026-09.    Filed December 15, 2011.

Steven M. Cyr, for petitioner.

John D. Davis, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  In these consolidated cases, petitioner seeks relief pursuant to section 6015(f) from joint and several liability for unpaid Federal income taxes for 1998 and 2000.[1]

---

[1]Unless otherwise indicated, all section references are to
(continued...)

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate by this reference.[2] When she petitioned the Court, petitioner resided in Oregon. During the years at issue petitioner and her former spouse, David Waldron (Mr. Waldron), resided in New Mexico, a community property State.

Background

Petitioner holds a Ph.D. in clinical psychology, and during the years at issue she was employed as a professor at the University of New Mexico. In 1998 Mr. Waldron was also employed there and had a fledgling consulting business. By 2000 his consulting business was his sole source of income.

Financial problems plagued the couple, and in 1998 they separated. In 2001 they divorced. The final divorce decree, filed in August 2001, required each spouse to assume and to

---

[1](...continued)
the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioner was ordered to file posttrial briefs but failed to do so. As a consequence we could hold petitioner to have conceded or waived all issues on which she has the burden of proof. See Stringer v. Commissioner, 84 T.C. 693, 706-708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). We decide this case, however, on the record as it stands, basing our understanding of petitioner's positions on her petition, her pretrial memorandum, and the presentation of her case at trial. See Scholet v. Commissioner, T.C. Memo. 2005-140. As discussed infra, petitioner's failure to file posttrial briefs has resulted in our deeming petitioner to have conceded some factual matters and has contributed to her failure to carry her burden of persuasion as to certain issues.

indemnify the other spouse for various specified debts, including "½ of taxes owed $10,000.00." The divorce decree also required petitioner to assume $21,000, and Mr. Waldron to assume $7,000, of other specified community debts. The divorce decree provided that "Any debt not listed shall be the sole responsibility of the party who created it."

Petitioner has remarried and is gainfully employed.

1998 and 2000 Joint Tax Returns

On or about February 19, 2003, petitioner and Mr. Waldron filed untimely joint Forms 1040, U.S. Individual Income Tax Return, for their 1998 and 2000 taxable years.[3] When she signed the returns petitioner suffered no abuse and had no mental or physical health problem.

According to the Form 1040 for 1998, petitioner earned $59,350 in wages, Mr. Waldron earned $27,969 in wages, and they had incidental amounts of income from other sources. Their 1998 return showed total tax liability of $12,659, an estimated tax penalty of $150, and, after taking into account Federal income tax withholding of $7,654, an underpayment of $5,155.

According to the Form 1040 for 2000, petitioner earned $75,503 in wages, and Mr. Waldron earned $20,607 through his consulting business. Their 2000 return also listed $32,900 for

---

[3]Respondent asserts that on the same date petitioner and Mr. Waldron also filed their 1999 joint return and that it also showed a balance due.

taxable pension and annuity distributions received by Mr. Waldron and incidental amounts of other income. Their 2000 return showed total tax liability of $29,072, an estimated tax penalty of $472, and, after taking into account Federal income tax withholding of $10,106, an underpayment of $19,438.

Installment Agreement

In April 2003 petitioner and Mr. Waldron secured an installment agreement to pay $760 a month on their unpaid tax liabilities for various years, including 1998, 1999, and 2000.[4] Petitioner and Mr. Waldron established a joint checking account for making the monthly installment payments. For about 3 years she deposited $530 into this account each month and Mr. Waldron deposited $230 each month. In July 2003 the first $760 payment to the Internal Revenue Service (IRS) was made from this joint account.[5] Monthly payments of $760 continued until June 2006, when the payments stopped and the installment agreement terminated, leaving unpaid balances for 1998 and 2000.[6]

---

[4]The administrative record contains no copy of this installment agreement and does not otherwise disclose its terms with any specificity.

[5]An earlier payment of $760 was tendered to the IRS in June 2003, but the check was dishonored.

[6]For reasons unexplained in the record, the IRS applied the payments mainly toward the 1999 tax liability.

## Requests for Innocent Spouse Relief

On May 13, 2008, petitioner submitted Form 8857, Request for Innocent Spouse Relief, with respect to tax years 1999, 2000, and 2001. On July 18, 2008, she submitted another Form 8857, requesting relief for tax year 1998. The Forms 8857 indicated identically that she had not reviewed the returns in question before signing them and that she had no knowledge of the tax law or data used to prepare them. On the Form 8857 for 1998, she indicated that when she signed the 1998 joint return she knew some amount was owed to the IRS for that year; on the Form 8857 for the other years she indicated the opposite with respect to the joint returns for those years.[7] The Forms 8857 indicated identically that, as of the time of the request for relief, petitioner's household had $25,848 in monthly income and $24,376 in monthly expenses.

## Final Determinations

Petitioner's requests for relief for 1998 and for the other years, including 2000, were assigned to different IRS personnel. In his final determination dated April 15, 2009, respondent denied petitioner's request for relief for 1998. The final determination recites relevant considerations for determining

---

[7]The parties have stipulated that petitioner indicated on Form 8857 that she knew there was a balance due on her 2000 joint return when she signed it. We disregard this stipulation as contrary to the facts disclosed by the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

relief under section 6015(f) but does not indicate how respondent applied those considerations in considering petitioner's request for relief.

In a separate final Appeals determination dated August 13, 2009, respondent denied petitioner's request for relief for 2000.[8]  The only reason stated in the determination for denial of relief is:  "You did not show it would be unfair to hold you responsible."

OPINION

Generally, married taxpayers may elect to file a joint Federal income tax return.  Sec. 6013(a).  After making the election, each spouse is jointly and severally liable for the entire tax due on their aggregate income.  Sec. 6013(d)(3).  An individual may seek relief from joint and several liability under section 6015, which offers three avenues of possible relief under subsections (b), (c), and (f).  In general, section 6015(b) provides full or apportioned relief from joint and several liability with respect to an understatement; section 6015(c) provides proportionate tax relief to divorced or separated taxpayers with respect to a deficiency; and in certain

---

[8]The record does not conclusively indicate why this determination did not address petitioner's request for relief for 1999 and 2001.  From such clues as we find in the record, it appears possible that the 1999 liability was paid off pursuant to an installment agreement, discussed infra, and that petitioner paid off the 2001 liability separately.  In any event, the years 1999 and 2001 are not in dispute in this case.

circumstances section 6015(f) provides equitable relief if relief is unavailable under section 6015(b) or (c).

In determining the appropriate relief available under section 6015, we apply a de novo scope and standard of review. See Porter v. Commissioner, 132 T.C. 203, 210 (2009).[9]  The burden is on petitioner to prove that she is entitled to equitable relief under section 6015(f).[10]  See Rule 142(a); Porter v. Commissioner, supra at 210.

Relief is available under section 6015(b) or (c) only with respect to understatements of tax.  Because petitioner's liabilities are due to underpayments rather than understatements of tax, her sole avenue of relief is section 6015(f).  See sec. 6015(f)(2); Washington v. Commissioner, 120 T.C. 137, 146-147 (2003).

A taxpayer who does not qualify for relief under section 6015(b) or (c) can qualify for relief under section 6015(f) if,

---

[9]Respondent argues vigorously on brief that we should review the Appeals officers' determinations for abuse of discretion on the basis of the administrative record.  We decline respondent's invitation to repudiate this Court's precedents.  We observe, however, that any review for abuse of discretion on the administrative record would be complicated by the fact that the final determinations upon which this case is predicated are devoid of any meaningful explanation.  Moreover, as discussed infra, insofar as we are able to discern the basis for these determinations in the assorted papers in the administrative record, these determinations in certain aspects appear contradictory or incomplete.

[10]Petitioner does not contend that the burden of proof should shift to respondent under sec. 7491(a).

taking into account all the facts and circumstances, it would be inequitable to hold the taxpayer liable for any unpaid tax or deficiency. Sec. 6015(f)(1). Rev. Proc. 2003-61, 2003-2 C.B. 296 (the revenue procedure), prescribes guidelines for determining whether an individual qualifies for relief under section 6015(f). This Court has looked to the revenue procedure as providing relevant factors for reviewing the IRS' denial of relief. See Washington v. Commissioner, supra at 147-152; McGhee v. Commissioner, T.C. Memo. 2010-259 n.8.

A. Threshold Conditions

The revenue procedure sets forth seven threshold conditions that the requesting spouse must satisfy before the Commissioner will consider a request for relief under section 6015(f). Rev. Proc. 2003-61, sec. 4.01(1)-(7), 2003-2 C.B. at 297. One threshold condition is that, subject to certain specified exceptions that do not pertain to this case, the income tax liability from which the requesting spouse seeks relief must be attributable to the other spouse. Id. sec. 4.01(7).

Respondent acknowledges that for 1998 and 2000 petitioner meets six of the threshold requirements but contends that she only partially satisfies this last-mentioned requirement. According to respondent, citing certain workpapers in the administrative file, only $320 of the 1998 underpayment and $15,259 of the 2000 underpayment are attributable to Mr. Waldron.

Petitioner has not disputed these assertions or offered any evidence in this regard. We deem petitioner to have conceded these matters. Accordingly, after taking into account the threshold conditions, petitioner's relief under section 6015(f) cannot exceed $320 for 1998 and $15,259 for 2000. To determine whether she is eligible for relief with respect to any portion of either amount, we turn to the next step of the analysis.

B. Safe Harbor Requirements for Relief

Insofar as the requesting spouse meets the threshold conditions, she ordinarily will qualify for equitable relief under section 6015(f) if she meets three "safe harbor" requirements. As discussed below, petitioner meets two of the safe harbor requirements wholly or partially but does not meet the third.

1. Marital Status

Petitioner satisfies this requirement because she and Mr. Waldron were divorced when she applied for relief. See Rev. Proc. 2003-61, sec. 4.02(1)(a), 2003-2 C.B. at 298.

2. Knowledge or Reason To Know

To satisfy this safe harbor requirement, the requesting spouse, when she signed the joint return, must not have known or have had reason to know that the nonrequesting spouse would not pay the income tax liability. Id. sec. 4.02(1)(b).

> If a requesting spouse would otherwise qualify for relief
> under this section, except for the fact that the requesting

spouse's lack of knowledge or reason to know relates only to a portion of the unpaid income tax liability, then the requesting spouse may receive relief to the extent that the income tax liability is attributable to that portion. [Id.]

Petitioner testified that when she signed the joint returns in question, she believed that Mr. Waldron would pay the tax shown on the returns because he told her he would. We take this testimony with a grain of salt because petitioner also acknowledged that Mr. Waldron had a history of late filing and of paying the couple's taxes late and that money problems were part of the reason they ultimately divorced. The relevant consideration is not whether she believed that Mr. Waldron would eventually pay the taxes but whether she believed that the taxes would be paid reasonably promptly after the filing of the joint return. See Schepers v. Commissioner, T.C. Memo. 2010-80; Banderas v. Commissioner, T.C. Memo. 2007-129.

About 2 months after filing the joint returns, petitioner and Mr. Waldron secured an installment agreement with the IRS to pay $760 a month toward their unpaid tax liabilities for 1998, 1999, and 2000. They set up a joint checking account for this purpose. Petitioner testified that the original understanding was that she and Mr. Waldron would each "put in half of the $760" each month. But she also testified that "I was concerned that once again my ex-husband would be irresponsible and pay late, and so to make sure there was enough money in there I paid $530 a month". Mr. Waldron paid $230 each month, which was almost

exactly 30 percent of the $760 installment payment.  This payment arrangement lasted for 3 years, when for reasons not clearly explained by the record, the payments stopped.[11]

Because the signing of the joint returns in question and the securing of the installment agreement were so nearly contemporaneous, we believe the installment agreement arrangement provides strong evidence of petitioner's beliefs and expectations as of the time she signed the joint returns.  And that evidence strongly suggests that when she signed the joint returns she reasonably believed that Mr. Waldron would pay 30 percent of the unpaid liabilities--a belief borne out by Mr. Waldron's actually paying this portion of the monthly installments for 3 years before the arrangement terminated.  Further supporting a conclusion that petitioner believed that Mr. Waldron would pay 30 percent of the tax liabilities, petitioner testified that upon her divorce she took on, and paid through a repayment plan, 70 percent of the couple's credit card debt.

In reaching our conclusions, we put little stock in petitioner's uncorroborated testimony that the original understanding was that Mr. Waldron would contribute one-half of the installment payments.  Commencing with the very first

---

[11]In her pretrial memorandum petitioner suggested that the payments stopped because Mr. Waldron embezzled money from the joint account.  But petitioner presented no evidence in this regard.

- 12 -

installment payment, it appears that petitioner assumed responsibility for 70 percent of the payments, just as she had assumed 70 percent of other community debts.  We are not persuaded that petitioner ever believed that Mr. Waldron would pay more than 30 percent of the tax liabilities.[12]

On brief respondent asserts that the Appeals officers properly found that petitioner lacked a reasonable belief that Mr. Waldron would pay the tax liabilities in question because: (1) She admitted on the Forms 8857 that she knew there were underpayments on both her 1998 and 2000 joint returns when she signed them;[13] (2) petitioner and Mr. Waldron had balances due for other years when she signed the returns;[14] (3) Mr. Waldron had a long history of noncompliance; and (4) petitioner and Mr. Waldron had ceased to comply with their installment agreement. But the relevant question is not whether petitioner knew there were underpayments on the returns for 1998 and 2000 (or for other years) but whether she knew or had reason to know, when she

---

[12]On brief respondent acknowledges that the Appeals officer who made the final determination for 2000 found that the installment agreement and divorce decree "may suggest a belief that * * * [petitioner's] spouse would satisfy one half of the underpayment."  But it appears that the Appeals officer was unaware that petitioner actually made 70 percent of the installment payments.

[13]Actually, petitioner's Form 8857 for 2000 indicated the opposite.  See supra note 7 and associated text.

[14]The record is inconclusive on this point.

signed these returns, that Mr. Waldron would not pay the 1998 and 2000 taxes.  See Rev. Proc. 2003-61, sec. 4.02(1)(b).  And although Mr. Waldron's track record in paying late might be a relevant consideration, the divorce decree and the installment agreement, as one Appeals officer acknowledged, see supra note 12, mitigated this consideration--especially in the light of the fact that Mr. Waldron actually made timely contributions toward the installment payments for 3 years.  And the eventual noncompliance with the installment agreement, coming 3 years after petitioner signed the joint returns, has scant bearing on what petitioner reasonably believed when she signed them.

We conclude that when she signed the joint returns in question petitioner reasonably believed that Mr. Waldron would pay 30 percent of the unpaid tax liabilities.  Accordingly, this consideration weighs in favor of relief to the extent of 30 percent of the amounts as to which petitioner is eligible for relief after application of the threshold factors, as discussed above.

3.  Economic Hardship

To satisfy the safe harbor requirements, the requesting spouse must also show that she will suffer economic hardship if relief is not granted.  Economic hardship exists if satisfaction of a debt in whole or in part will cause an individual taxpayer to be unable to pay his or her reasonable basic living expenses.

Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.; Rev. Proc. 2003-61, sec. 4.02(1)(c).

Petitioner's only argument that she will suffer economic hardship, as expressed in her pretrial memorandum, is that she no longer has the high-paying practice that she had in the early 2000s. Petitioner reported on her Forms 8857 that, as of the time the forms were filed in 2008, her household had $25,848 in monthly income and $24,376 in monthly expenses. Petitioner presented no evidence at trial that would indicate that these representations were incorrect or that her financial situation has deteriorated. Because the forms indicate that petitioner's household has a monthly budget surplus of $1,472, we are not persuaded that paying the tax liabilities in question would render her unable to pay reasonable basic living expenses as necessary to establish economic hardship.

4. Summary of Conclusions About Safe Harbor Relief

In sum, petitioner meets, at least partially, two of the safe harbor requirements but fails the economic hardship requirement. Consequently, the safe harbor relief is not available. We turn to the next step of the analysis.

C. Facts and Circumstances Test

A requesting spouse such as petitioner who satisfies the threshold conditions under the revenue procedure but does not qualify for safe harbor relief is nevertheless eligible for

relief under section 6015(f) if, taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable for an underpayment on a joint return.  The revenue procedure lists various factors to be considered in deciding whether to grant equitable relief under section 6015(f).  Rev. Proc. 2003-61, sec. 4.03(2), 2003-2 C.B. at 298-299.  No single factor is determinative, all factors are to be appropriately considered, and the listing of factors is not intended to be exhaustive.  Id.; see Porter v. Commissioner, 132 T.C. at 214. Our analysis of the relevant facts and circumstances is set forth below.

1.  Marital Status

As previously discussed, this factor is favorable to petitioner.

2.  Knowledge or Reason To Know

As previously discussed, this factor weighs in favor of granting petitioner relief to the extent of 30 percent of the amounts of the underpayments that are attributable to Mr. Waldron.

3.  Economic Hardship

As previously discussed, this factor weighs against relief.

4.  Nonrequesting Spouse's Legal Obligation To Pay Pursuant to a Divorce Decree or Agreement

If the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or

agreement, this factor weighs in favor of relief unless "the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax liability." Rev. Proc. 2003-61, sec. 4.03(2)(a)(iv).

Respondent does not dispute that Mr. Waldron had a legal obligation under the divorce decree to pay one-half of the joint taxes owed.[15] To the contrary, respondent asserts on brief that the Appeals officers who considered petitioner's requests for relief properly evaluated this factor adversely to petitioner because "the nonrequesting spouse's legal obligation under the divorce decree only applied to half of their joint tax liabilities." For the same reason that a reasonable belief that the nonrequesting spouse will pay only a portion of an unpaid income tax liability counts toward partial relief, see id. sec. 4.02(1)(b), we believe that the nonrequesting spouse's legal obligation to pay a portion of an outstanding relief should similarly count toward partial relief.

On brief respondent also suggests that the divorce decree is irrelevant because it was signed before the joint returns in

---

[15]The divorce decree required petitioner and Mr. Waldron each to pay "½ of the taxes owed $10,000.00." Although this wording is not free of ambiguity, we believe that, read in conjunction with other provisions of the divorce decree, it is fairly construed to require each spouse to pay one-half of their joint tax liabilities.

question were filed.  But, as just discussed, respondent has effectively conceded that the divorce decree obligated Mr. Waldron to pay one-half of joint taxes owed.  In the light of that concession, the pertinent question is not whether the joint returns were filed after the divorce decree was signed but whether, as of the date the divorce decree was signed, petitioner knew or should have known that Mr. Waldron would not honor the obligation that the divorce decree imposed upon him.

As previously discussed, upon her divorce petitioner assumed 70 percent of the community debts and Mr. Waldron assumed the other 30 percent.  As we have seen, this 70-30 split carried over and governed the couple's contributions to the tax installment payments, notwithstanding that the divorce decree obligated Mr. Waldron to pay one-half of the tax liabilities.  These circumstances strongly suggest that when the divorce decree was signed petitioner reasonably believed that Mr. Waldron would pay at least 30 percent of community debts, including tax liabilities.  To that extent, this factor is favorable to petitioner.

### 5. Significant Benefit

This factor weighs against relief if the requesting spouse "received significant benefit (beyond normal support) from the unpaid income tax liability or item giving rise to the deficiency."  Rev. Proc. 2003-61, sec. 4.03(2)(a)(v), 2003-2 C.B.

at 299. Respondent's Appeals officers found that petitioner received no significant benefit from the unpaid income tax liability. Respondent does not contend otherwise in this proceeding. This factor supports granting relief.

6. <u>Abuse</u>

Petitioner suffered no abuse when she signed the returns. This factor is neutral.

7. <u>Health Problems</u>

Petitioner suffered no serious health problems when she signed the returns. This factor is neutral.

8. <u>Compliance With Federal Tax Laws</u>

This factor weighs in favor of relief if the requesting spouse has made a good-faith effort to comply with income tax laws in taxable years following the years for which she requests relief. <u>Id.</u> sec. 4.03(2)(a)(vi). According to the administrative record, the Appeals officers made seemingly contradictory findings about this factor. The Appeals officer who denied petitioner's request for relief for 1998 found that she had failed to make a good-faith effort to comply with the tax laws for tax years 2001 and 2003 through 2006. By contrast, the Appeals officer who denied petitioner's request for relief for 2000 found that she had made a good-faith effort to comply with the tax laws. But we need not attempt to referee these competing administrative determinations because, as discussed in more

detail below, resolution of this factor does not affect our ultimate conclusion under the facts and circumstances test.

9. <u>Summary of Conclusions Under Facts and Circumstances Test</u>

Four factors favor at least partial relief--petitioner's marital status, her reasonable belief that Mr. Waldron would pay 30 percent of the joint tax liabilities, his legal obligations under the divorce decree, and the lack of significant benefit to petitioner. Two factors are neutral--lack of abuse and lack of health problems. Setting aside for the moment the issue of whether petitioner made a good-faith effort to comply with tax laws for later years, the only factor weighing against relief is petitioner's lack of economic hardship. Even if we were to assume, for sake of argument, that petitioner failed the compliance requirement, the totality of factors would still favor relief.

D. <u>Conclusion</u>

For the reasons discussed above, petitioner is entitled to relief under section 6015(f) for 30 percent of the underpayments that are attributable to Mr. Waldron's items of income.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.