# United States Tax Court

T.C. Memo. 2023-10

KARI JANE FREMAN,
Petitioner,
AND RODNEY C. FREMAN,
Intervenor

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 8895-20.　　　　　　　　　　　Filed January 23, 2023.

————

Kari Jane Freman, pro se.

Rodney C. Freman, pro se.

*Christine A. Fukushima*, *Min Young Chan*, *Patrick J. Coleman*, and *Jeffrey A Rodgers*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*: This case arises from the request of petitioner, Kari Jane Freman, made pursuant to section 6015,[1] seeking relief from joint and several liability for federal income tax obligations arising from tax returns she jointly filed with her former spouse and intervenor in this case, Rodney C. Freman, for taxable years 2012, 2014, and 2015. For taxable year 2012 Ms. Freman seeks relief under section 6015(b), (c), or (f) from an understatement of tax liability resulting from the

————

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulatory references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] failure to report a taxable distribution from Mr. Freman's retirement account. For taxable years 2014 and 2015 Ms. Freman seeks relief under section 6015(f) from the underpayments of tax liabilities shown as due on the couple's returns.[2] For the reasons discussed below, we will grant partial relief to Ms. Freman.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The First Stipulation of Facts and the Exhibits attached thereto, including the administrative record, are incorporated herein by this reference. Ms. Freman resided in California when she timely filed her Petition, but she currently lives in Tennessee. Mr. Freman timely filed a Notice of Intervention.

I.    *The Marriage*

On September 12, 1998, Ms. Freman married Mr. Freman; they subsequently had a child. During the tax years at issue Ms. Freman and Mr. Freman resided in California. Ms. Freman has a high school education, was not employed outside of the home during the tax years at issue, and primarily took care of the couple's child. Throughout most of the marriage, with limited exceptions, Mr. Freman was employed as a full-time commodities trader for Monex Deposit Corp. (Monex).

Ms. Freman and Mr. Freman had their share of financial difficulties, and finances were often a source of contention during their marriage. Ms. Freman and Mr. Freman maintained joint checking and savings accounts throughout their marriage. Additionally, Mr. Freman, through his work with Monex, had a retirement account administered by J.P. Morgan (Retirement Account).

However, while Ms. Freman and Mr. Freman maintained joint accounts during their marriage, Mr. Freman was solely responsible for making all financial decisions during the tax years at issue. Mr. Freman handled the filing of tax returns during the marriage; and while Ms. Freman was originally responsible for paying household bills, Mr.

---

[2] An understatement of tax occurs when a taxpayer does not properly report the amount of tax due, such as by omitting income from the return, improperly characterizing income, or claiming an erroneous deduction. *See* Treas. Reg. § 1.6015-1(h)(4). An underpayment occurs when a taxpayer properly reports the amount of tax due but does not pay that amount. *See Leith v. Commissioner*, T.C. Memo. 2020-149, at *24–25.

[*3] Freman "would get angry" that the bank account balances were decreasing, and he took that responsibility away from Ms. Freman. Thereafter, the couple paid a number of bills late, including health insurance premiums, electricity bills, water bills, and more.

Mr. Freman oversaw the filing of the couple's joint federal income tax returns,[3] and he retained Jerry Butler to prepare the tax returns for the years at issue. Ms. Freman was not involved in the preparation of the tax returns, and she was not given an opportunity to review the contents of their returns before signing them. Mr. Freman told Ms. Freman to hurry up and sign the returns because "there was no time," and "he had to get [them] in the mail [or else] . . . the IRS was going to . . . garnish[] his wages."

Additionally, Ms. Freman and Mr. Freman each maintain that they suffered from significant health problems during the marriage, while maintaining that the other did not. While the precise timeline is unclear, Ms. Freman was hospitalized in an intensive care unit for a time in 2015 and was subsequently prescribed narcotics to help her with pain management. Meanwhile, in 2012, Mr. Freman was diagnosed with an autoimmune disease that required him to obtain disability leave.

However, the disability insurance was not enough to cover household expenses during the period of Mr. Freman's disability. As a result, in tax year 2012 Mr. Freman took a taxable distribution from his Retirement Account to help the couple meet their financial obligations. In order to receive the distribution, Mr. Freman signed and submitted a "Termination/Distribution Form," and Ms. Freman signed a notarized spousal consent form, thereby waiving her rights to the Qualified Annuity Benefit otherwise available under the retirement plan. Mr. Freman's Internal Revenue Service (IRS) Wage and Income Tax Transcripts show a distribution of $172,342 and withholding tax of $34,468. The distributed funds were used for regular household expenditures in 2012 and 2013.

Additionally, because of the limitations imposed by the plan administrator, Mr. Freman was not permitted to borrow against his Retirement Account. Thus, Mr. Freman terminated his employment with Monex to take the distribution. Because of the circumstances of his

---

[3] Ms. Freman argues that she did not sign the tax returns at issue. We discuss that argument below. *See infra* Part III.A.

[*4] separation, there was an understanding that Monex would rehire Mr. Freman in the future.

On the limited facts in the record, it appears that Ms. Freman is working part time, but she may be pursuing some form of disability assistance. Meanwhile, Mr. Freman was rehired by Monex in 2014, and he continued his employment through at least 2015.

## II.   *Tax Liabilities*

### A.   *Tax Year 2012 Understatement*

Ms. Freman and Mr. Freman timely filed a joint request for an extension of time to file their 2012 tax return, but they failed to timely file a return by the extended deadline. On or around February 29, 2016, the IRS prepared a substitute for return (SFR) in accordance with section 6020 that asserted a deficiency of $85,238 and withholding of $36,057.[4] All income for the taxable year was attributable to Mr. Freman, including inter alia $5,428 from a prior year state refund, $68,025 of wages reported on Form W–2, Wage and Tax Statement, from Mr. Freman's employment at Monex, and $172,342 of income for the taxable distribution from Mr. Freman's Retirement Account.

After receiving the SFR, Ms. Freman and Mr. Freman filed Form 1040A, U.S. Individual Income Tax Return, dated March 9, 2016.[5] However, the Form 1040A did not report the taxable distribution from the Retirement Account or the taxes withheld. On April 27, 2016, the IRS issued a revised examination report showing adjustments to the Form 1040A. The IRS also assessed additions to tax under section 6651(a)(1) and (2) because of the untimeliness of the 2012 return and the failure to make payment.

---

[4] The parties stipulated that on or around February 29, 2016, the IRS prepared a substitute for return in accordance with section 6020. The Court notes that this appears to be the date that the IRS sent Letter 1862, Initial Contact Letter–Substitute for Return. However, Ms. Freman and Mr. Freman's Account Transcript for Tax Year 2012 states that a 2012 return was either due or received (whichever is later) on June 1, 2015, and processed on June 29, 2015. This is consistent with another June 29, 2015, entry on the account transcript that states: "Substitute tax return prepared by IRS." In any event, this discrepancy has no material impact on the resolution of this matter, so we will defer to the stipulation.

[5] The Form 1040A is labeled an "amended return" on Ms. Freman and Mr. Freman's IRS Account Transcript for taxable year 2012. Ms. Freman and Mr. Freman did not, however, submit Form 1040X, Amended U.S. Individual Income Tax Return.

[*5]   The IRS issued a notice of deficiency to Ms. Freman and Mr. Freman on July 8, 2016. Neither filed a petition with this Court to challenge the notice of deficiency. On January 2, 2017, the IRS assessed a deficiency of $60,953 and additions to tax and penalties. Ms. Freman and Mr. Freman established an installment plan around June 2016 but ultimately stopped making payments.

### B.     *Tax Year 2014 Underpayment*

On or around November 9, 2016, Ms. Freman and Mr. Freman filed an untimely joint return for taxable year 2014. The 2014 tax return reported adjusted gross income totaling $82,234 and income tax liability of $6,789. All income for the taxable year was attributable to Mr. Freman. Because of the untimeliness of the 2014 return and the failure to make payment, the IRS assessed additions to tax under section 6651(a)(1) and (2).

### C.     *Tax Year 2015 Underpayment*

On October 16, 2016, Ms. Freman and Mr. Freman filed an untimely joint return for taxable year 2015. The 2015 tax return reported adjusted gross income of $91,182 and income tax liability of $8,064. The tax liability shown on the 2015 return is solely attributable to Mr. Freman. However, Mr. Freman, who oversaw the preparation of the 2015 tax return, did not report $11,883 in cancellation of indebtedness income attributable to Ms. Freman's credit card expenditures.[6] Because of the untimeliness of the 2015 return and the failure to make payment, the IRS assessed additions to tax under section 6651(a)(1) and (2).

---

[6] The parties stipulated that "[Ms. Freman] was not issued any information returns according to her 2015 Wage and Income Transcript, a copy of which is attached hereto as Exhibit 21-R." Contrary to the parties' stipulation, Ms. Freman's Wage and Income Transcript reflects that she was issued Form 1099–C, Cancellation of Debt. This form states that $10,349 of principal credit card expenditures and $1,534 of interest were canceled on December 31, 2015. *See, e.g.*, *Brooks v. Commissioner*, T.C. Memo. 2012-25, 2012 WL 246459, at *3 (stating that the Code generally treats discharge of indebtedness as income, including both principal and interest, subject to limited exceptions). This stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. *See Cal-Maine Foods, Inc. v. Commissioner*, 93 T.C. 181, 195 (1989).

[*6] III. *Divorce*

Ms. Freman filed for divorce, and Mr. Freman was served with a petition for divorce, sometime in November 2017.[7] After filing for divorce, Ms. Freman and her minor child resided in the marital residence until on or about March 10, 2018, when she moved into a recreational vehicle. A judgment of dissolution was entered in or about July 2021 by the Superior Court of California, County of Riverside.[8] Proceedings are still pending to determine spousal and child support, as well as to determine the outcome of the property settlement.

IV. *Ms. Freman's Request for Section 6015 Spousal Relief*

On February 21, 2019, the IRS's Cincinnati Centralized Innocent Spouse Operation (CCISO) received Ms. Freman's Form 8857.[9] Ms. Freman stated: "I just signed where he told me to, unaware who [sic] or when [the returns] were being filed." On the Form 8857, Ms. Freman responded "no" to question 8, asking whether she or another family member were subject to spousal abuse or domestic violence during the tax years at issue. Nonetheless, she completed Part V, which is reserved for requesting taxpayers who "were (or are now) a victim of domestic violence or spousal abuse."

Ms. Freman indicated on Form 8857 that Mr. Freman (1) physically harmed or threatened her, her children, or other family members, (2) made her afraid to disagree with him, (3) criticized or insulted her or frequently put her down, (4) withheld money for food, clothing, or other basic needs, and (5) made most or all of the decisions for her, including financial decisions. Ms. Freman also stated that

> [Mr. Freman] was verbally & mentally abusive to myself
> and my daughter, daughters school have CPS [sic] to the

---

[7] Ms. Freman's Form 8857, Request for Innocent Spouse Relief, states that she and Mr. Freman legally separated on November 10, 2017, and that the divorce would be finalized on September 26, 2018. At trial Ms. Freman's testimony clarified that Mr. Freman was served with the divorce proceedings only in November 2017. There is no evidence that the parties obtained a legal separation before obtaining a judgment of dissolution in or about July 2021.

[8] The record does not contain any documentary evidence stating when Ms. Freman and Mr. Freman's decree of divorce was entered, but the parties testified that a judgment of dissolution was entered in or about July 2021.

[9] Ms. Freman's Form 8857 is dated August 9, 2018, but was not received by CCISO until February 21, 2019.

**[*7]** house regarding his physical abuse / corp. punishment to our daughter. He was awarded 1 HR week [sic] of supervised visitation due to anxiety he causes [our daughter.]

Additionally, Ms. Freman stated in Part VI, additional information, that

> [Mr. Freman] would become verbally & mentally abusive when monetary matters were involved. I trusted he would handle and take care of all IRS doings as I never knew who was preparing our taxes, what we owed or why . . . .

> I had to get my daughter out of 2 toxic abusive relationship that cause great anxieties (see attached letter from Yvette Chavez [Marriage Family Therapist)]. He was awarded supervised visitation for 1 HR. week to which she refuses to go. My daughter has a therapy dog and horse due to anxiety brought on [illegible] the father (Rod) . . .

> I have yet to find out who prepared taxes, I was not informed of filings currently[.] I was not involved with finances of paying joint bills or utilities. He took them from me, and did not involve me in household finances unless they were late and he would get verbally abusive.

Ms. Freman's Form 8857 indicated that she had a checking account with $300, total monthly income of $1,160, and total monthly expenses (for herself and child) of $1,910. Ms. Freman did not attach any supporting documentation to her Form 8857.[10]

In response to Ms. Freman's request for relief, Mr. Freman filed Form 12508, Questionnaire for Non-Requesting Spouse. Mr. Freman alleged inter alia that Ms. Freman (1) prepared or helped prepare their returns, (2) gathered receipts and canceled checks, (3) gave tax documents to the person who was preparing the returns, (4) asked the

---

[10] On her Form 8857 Ms. Freman says: "[S]ee attached letter from Yvette Chavez MFT." The Court notes that no such attachment is included in the record. The CCISO evaluation reflects that Full Scope Tax Examiner C. Norris (TE Norris) asked Ms. Freman for information regarding instances of abuse, but that none was submitted. Further, no such letter was listed in the "supporting materials" considered by TE Norris. Similarly, Appeals Officer David Rassenfoss (AO Rassenfoss) stated that "[t]he [requesting spouse] made general unsupported allegations [of abuse] that were not supported with documentation and were refuted by the [nonrequesting spouse]."

[*8] person who prepared the returns to explain any items or amounts, and (5) reviewed the returns before filing them. Further, Mr. Freman stated that Ms. Freman was "[a]lways!" aware of any financial problems.

CCISO assigned Ms. Freman's request to TE Norris. Relying on Ms. Freman's allegations, TE Norris believed that she should receive a full grant of spousal relief for the tax years at issue. For the taxable year 2012 understatement, TE Norris granted preliminary relief under section 6015(c), finding that Ms. Freman did not have actual knowledge of the understatement and Mr. Freman handled all the finances, among other considerations.[11] For the taxable year 2014 and 2015 underpayments, TE Norris granted preliminary relief under section 6015(f), finding that Ms. Freman met the streamlined factors for relief because, among other things, Mr. Freman maintained exclusive control over the household finances.

On July 30, 2019, the IRS issued a preliminary determination, granting Ms. Freman full relief for the tax years at issue. In response, Mr. Freman submitted Form 12509, Statement of Disagreement, received August 21, 2019, and requested reconsideration from the IRS Independent Office of Appeals (Appeals).

Mr. Freman's appeal of the preliminary determination was assigned to AO Rassenfoss. AO Rassenfoss held separate phone calls with Ms. Freman and Mr. Freman to discuss the case. On February 13, 2020, Appeals issued a notice of final determination, denying Ms. Freman's request for relief for the tax years at issue.

Appeals determined that Ms. Freman's actual knowledge of the items of income made her ineligible for relief under section 6015(b) or (c).[12] Appeals found that Ms. Freman met the threshold requirements for relief under 6015(f), but she did not meet the streamlined factors for relief. AO Rassenfoss determined that Ms. Freman was not entitled to streamlined relief because she had knowledge of the omitted items and did not have a reasonable expectation that Mr. Freman would pay the

---

[11] CCISO's determination appears to be partially based on Ms. Freman's erroneous representation on her Form 8857 that she and Mr. Freman were legally separated on November 10, 2017. CCISO's determination states that "[n]o info provided, did ask[] for decree or separation papers, nothing submitted."

[12] Appeals denied relief under section 6015(c) because of Ms. Freman's knowledge and does not appear to have relied on Ms. Freman's erroneous representation on her Form 8857 that she and Mr. Freman were legally separated on November 10, 2017.

[*9] taxes. AO Rassenfoss also determined that Ms. Freman was not entitled to relief under the full equitable relief analysis for the same reason.[13]

In its conclusion, the Appeals Case Memorandum states that "[c]onsidering the totality of all the facts and circumstances, [Mr. Freman's] appeal was considered and CCISO's determination to allow relief [is] found to be unsupported by fact and law. . . . It would be unfair to simply grant relief when [Ms. Freman] has failed to satisfy her burden of proof."

## OPINION

### I.  *Jurisdiction*

The Tax Court is a court of limited jurisdiction and can exercise its jurisdiction only to the extent provided by Congress. § 7442; *Judge v. Commissioner*, 88 T.C. 1175, 1180–81 (1987); *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985); *see also* Rules 13(a) and (b), 320(b). Pursuant to section 6015(e), this Court has jurisdiction to review a stand-alone petition when the taxpayer files a petition no later than the close of the 90th day after the Commissioner has issued a final determination denying the requesting spouse's claim for relief. *See* § 6015(e)(1)(A)(ii), (i)(I).

Ms. Freman timely filed a stand-alone Petition with this Court on July 10, 2020.[14] Accordingly, this Court has jurisdiction under section 6015(e) to review Appeals' final determination denying Ms. Freman's request for relief for the tax years at issue. Additionally, pursuant to section 6015(e)(4) and Rule 325, Mr. Freman filed a Notice of Intervention and became a party to this case, opposing relief, on March 21, 2022.

---

[13] Appeals analyzed the factors in the following manner. Factors for Relief: Marital Status. Neutral Factors: Economic Hardship, Legal Obligation to Pay, Significant Benefit, Mental or Physical Health. Factors Against Relief: Knowledge, Tax Compliance. Appeals also determined that the abuse factor was neutral and did not negate the knowledge factor because Ms. Freman made general and unsupported allegations of abuse that were not supported by documentation and lacked specificity.

[14] The notice of determination at issue is dated February 13, 2020, meaning the 90-day period to file a petition with this Court originally ended on May 13, 2020. However, because of the COVID-19 pandemic, Ms. Freman's deadline to file with this Court was extended until July 15, 2020. *See* I.R.S. Notice 2020-23, 2020-18 I.R.B. 742.

**[\*10]** II.     *Preliminary Matters*

A.     *Evidentiary Considerations*

First, the scope of review in the present matter is limited. Subsection (e)(7) was added to section 6015 by the Taxpayer First Act, Pub. L. No. 116-25, § 1203, 133 Stat. 981, 988 (2019). Section 6015(e)(7) provides that the scope of our review is limited to the "administrative record established at the time of the determination, and . . . any additional newly discovered or previously unavailable evidence." *See Soler v. Commissioner*, T.C. Memo. 2022-78, at \*5–6. Section 6015(e)(7) applies to all petitions filed with this Court on or after July 1, 2019, the date of enactment. *See Sutherland v. Commissioner*, 155 T.C. 95, 96–97, 105 (2020). Ms. Freman's Petition was filed on July 10, 2020, and thus section 6015(e)(7) is applicable. We will consider the 34 stipulated Exhibits[15] that were admitted into evidence without objection (all but Exhibit 34-R were part of the administrative record).[16] In addition, we will consider Ms. Freman and Mr. Freman's testimony, which was not part of the administrative record. *See Sleeth v. Commissioner*, T.C. Memo. 2019-138, at \*3, *aff'd*, 991 F.3d 1201 (11th Cir. 2021).

Second, the Court, through its review of the record, has noted that Exhibit 34-R, a copy of the Retirement Account Termination/ Distribution Form and attached spousal consent form, is an incomplete document. The Exhibit contains only pages one, four, and five; pages two and three are not included in the record. The incomplete nature of the document will affect the weight that it is accorded in our findings. *See, e.g.*, *Barnes v. Commissioner*, T.C. Memo. 2004-266, 2004 WL 2650717, at \*8.

---

[15] This case was originally set for a remote trial at the San Diego, California, trial session on September 20, 2021, but was ultimately continued. In anticipation of that trial session, Ms. Freman submitted a Pretrial Memorandum to the Court (Doc. 16). Ms. Freman's Pretrial Memorandum included a number of attachments in the nature of evidence. While the extent to which we could consider these documents is unclear, none of these attachments were included in or attached to the First Stipulation of Facts and were not otherwise offered or admitted into evidence. Accordingly, the Court cannot consider them.

[16] Stipulation of Fact ¶ 43 states that "[o]n March 22, 2022, Mr. Freman provided a legible copy of documents relating to his pension and annuities distribution in tax year 2012, a copy of which is attached hereto as Exhibit 34-R." Because the parties stipulated the inclusion of Exhibit 34-R and because it was admitted without objection, we assume without deciding that Exhibit 34-R constitutes "newly discovered or previously unavailable" evidence within the meaning of section 6015(e)(7).

**[\*11]** B.     *Credibility of Witnesses*

In deciding whether a taxpayer has carried her burden of proof, witness credibility is an important consideration. *Ishizaki v. Commissioner*, T.C. Memo. 2001-318, 2001 WL 1658189, at \*7. "[T]he distillation of truth from falsehood . . . is the daily grist of judicial life." *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972). "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." *Kropp v. Commissioner*, T.C. Memo. 2000-148, 2000 WL 472840, at \*3. Generally, we found Ms. Freman's testimony to be credible. In contrast, we found some, but not all, of Mr. Freman's testimony to be lacking in credibility, sincerity, and candor.

III.     *Section 6015*

Married taxpayers may elect to file a joint federal income tax return. § 6013(a). If a joint return is made, the tax is computed on the spouses' aggregate income, each spouse is fully responsible for the accuracy of the return, and each spouse is jointly and severally liable for the entire amount of tax shown on the return or found to be owing. § 6013(d)(3); *Butler v. Commissioner*, 114 T.C. 276, 282 (2000). Nevertheless, section 6015 provides three potential avenues and procedures for relief from joint and several liability: (1) full or partial relief for an understatement of tax under section 6015(b), (2) proportionate relief for an understatement of tax under section 6015(c), and (3) full or partial relief for an understatement or underpayment of tax under section 6015(f).

Ms. Freman seeks relief from joint and several liability under section 6015(b), (c), and (f) for the understatement for taxable year 2012 and under section 6015(f) for the underpayment for taxable years 2014 and 2015. We apply a de novo standard of review to any determination made by the Commissioner under section 6015. § 6015(e)(7); *see Porter v. Commissioner*, 132 T.C. 203, 210 (2009), *superseded in part by statute*, Taxpayer First Act § 1203, 133 Stat. at 988. As previously discussed, our scope of review is limited to the administrative record established at the time of the Commissioner's determination and any newly discovered or previously unavailable evidence. § 6015(e)(7). Ms. Freman, as the requesting spouse, generally bears the burden of proving that she is entitled to relief. *See* Rule 142(a); *Porter*, 132 T.C. at 210.

[*12]  A.    *Joint Return Requirement, Generally*

As discussed further below, the availability of each type of relief under section 6015 depends upon the filing of a joint return. *See* § 6015(a)(1), (b)(1)(A), (c)(1); Treas. Reg. §§ 1.6015-2(a)(1), 1.6015 3(a), 1.6015-4(a), (c); *see also* Rev. Proc. 2013-34, § 4.01, 2013 43 I.R.B. 397, 399. Whether a joint return was filed is a question of fact, the resolution of which depends on the intent of the parties. *Okorogu v. Commissioner*, T.C. Memo. 2017-53, at *19 (citing *Heim v. Commissioner*, 27 T.C. 270, 273–74 (1956), *aff'd*, 251 F.2d 44 (8th Cir. 1958)). To file jointly, both spouses must intend to make a joint return. *See Lane v. Commissioner*, 26 T.C. 405, 408–09 (1956).

Ms. Freman alleges that she did not sign the returns for the tax years at issue and that Mr. Freman forged her signatures.[17] As a consequence of this argument, if it is true that Ms. Freman did not file joint returns for the tax years, her assertion would be self-defeating because filing a joint return is a prerequisite to obtaining relief from joint and several liability under section 6015. *See* § 6015(a); *Franc v. Commissioner*, T.C. Memo. 2010-79, 2010 WL 1558333, at *1–2; *see also Raymond v. Commissioner*, 119 T.C. 191, 195–97 (2002). In any event, Ms. Freman has stipulated that she and Mr. Freman filed joint returns for the tax years at issue. We treat this stipulation as a conclusive admission. *See* Rule 91(e); *see also Franc v. Commissioner*, 2010 WL 1558333, at *1.

---

[17] We rely on the parties' stipulation that Ms. Freman and Mr. Freman filed a joint return, but we will briefly address some of Ms. Freman's arguments. A copy of the 2012 return is not included in the record, the 2014 paper return includes a signature for Kari Freman, and the 2015 return was filed electronically. The signature on the 2014 return is similar to Ms. Freman's signature as it appears on other documents in the record. But even if Ms. Freman did not sign the returns, this does not necessarily mean that they were not joint returns. *See Harris v. Commissioner*, T.C. Memo. 1961-324, 1961 WL 565. If an income tax return is intended by both spouses as a joint return, it is not determinative that one spouse failed to sign it. *Lane*, 26 T.C. at 408. Ms. Freman did not file a separate return for any of the tax years at issue, and she did not otherwise attempt to disavow the filed returns. *See Heim*, 27 T.C. at 274. Further, the couple filed joint tax returns throughout the marriage and Mr. Freman always handled the preparation of the tax returns during the marriage, which indicates a level of historic reliance on Mr. Freman to file returns. *See Estate of Campbell v. Commissioner*, 56 T.C. 1, 12–13 (1971). Additionally, Ms. Freman testified that she signed the returns because she "trusted that [Mr. Freman] would handle [the taxes] appropriately." These actions indicate, at some level, tacit consent to the filing of joint returns, and Ms. Freman would otherwise fail to satisfy her burden of establishing that she did not intend to file joint returns with Mr. Freman.

**[\*13]** B.     *Section 6015(b) Relief*

1.     *Section 6015(b), Generally*

Ms. Freman seeks relief under section 6015(b) for the understatement of tax for taxable year 2012. To qualify for relief under section 6015(b), the requesting spouse must satisfy all of the following conditions: (A) a joint return was filed for the taxable year; (B) there was an understatement of tax attributable to erroneous items of the nonrequesting spouse on the return; (C) the requesting spouse did not know and had no reason to know of the understatement at the time that the return was signed; (D) taking into account all of the facts and circumstances, it is inequitable to hold the requesting spouse liable for the deficiency in tax attributable to such understatement; and (E) the requesting spouse made a timely election for relief under section 6015(b).[18] § 6015(b)(1). Ms. Freman bears the burden of proving her entitlement to relief under section 6015(b). *Alt v. Commissioner*, 119 T.C. 306, 311 (2002), *aff'd*, 101 F. App'x 34 (6th Cir. 2004).

These conditions are stated in the conjunctive, and thus a failure to meet any one of them precludes relief under section 6015(b). *Alt*, 119 T.C. at 313; *Haltom v. Commissioner*, T.C. Memo. 2005-209, 2005 WL 2132599, at \*4. However, under certain limited circumstances, a requesting spouse may receive partial relief if they satisfy every requirement except the lack of knowledge requirement. *See* § 6015(b)(2).

Respondent concedes that Ms. Freman satisfies the requirements of section 6015(b)(1)(A), (B), and (E). Ms. Freman and Mr. Freman filed a joint return for taxable year 2012, the understatement on the return was solely attributable to Mr. Freman, and Ms. Freman made a timely election for relief because respondent has not begun collection activities for the 2012 tax liability. Respondent argues, however, that Ms. Freman does not satisfy the lack of knowledge or reason to know requirement under section 6015(b)(1)(C) or the equitable considerations requirement under section 6015(b)(1)(D).

---

[18] The requirements of section 6015(b)(1)(C) and (D) are "virtually identical" to the requirements of former section 6013(e)(1)(C) and (D). *Doyel v. Commissioner*, T.C. Memo. 2004-35. Thus, cases analyzing those requirements are instructive to our analysis. *Id.*; *see also Butler*, 114 T.C. at 283.

**[*14]**      2.      *Lack of Knowledge Requirement*

Under section 6015(b)(1)(C), the requesting spouse must establish that in signing the return he or she did not know and had no reason to know the return contained an understatement. A requesting spouse has knowledge or reason to know of an understatement if he or she actually knew of the understatement or if a reasonable person in similar circumstances would have known of the understatement. *Jacobsen v. Commissioner*, T.C. Memo. 2018-115, at *11, *14 (citing Treas. Reg. § 1.6015-2(c)), *aff'd*, 950 F.3d 414 (7th Cir. 2020); *see also Pietromonaco v. Commissioner*, 3 F.3d 1342, 1345 (9th Cir. 1993), *rev'g* T.C. Memo. 1991-361.

"A taxpayer who signs a return is generally charged with constructive knowledge of its contents." *Porter*, 132 T.C. at 211. A taxpayer seeking to establish they had no reason to know of an understatement "must show that she was unaware of the circumstances that gave rise to the error and not merely unaware of the tax consequences. . . . Section 6015 does not protect a spouse who turns a blind eye to facts readily available to her." *Id.* at 212. Notwithstanding a requesting spouse's knowledge or reason to know, a requesting spouse may receive partial relief if they establish that he or she did not know and had no reason to know the full extent of the understatement. *See* § 6015(b)(2); *Jacobsen*, T.C. Memo. 2018-115, at *11.

a.      *Actual Knowledge*

A spouse lacks actual knowledge if she is unaware of the circumstances that give rise to the error on the tax return. *Soler*, T.C. Memo. 2022-78, at *7 (citing *Bokum v. Commissioner*, 94 T.C. 126, 145–46 (1990), *aff'd*, 992 F.2d 1132 (11th Cir. 1993)). We must consider all facts and circumstances when determining whether a requesting spouse had actual knowledge of an understatement. Treas. Reg. §§ 1.6015-2(c), 1.6015-3(c)(2)(iv). In the case of omitted income, actual knowledge generally means knowledge of receipt of the income. Treas. Reg. §§ 1.6015-2(c), 1.6015-3(c)(2)(i)(A).

Ms. Freman had actual knowledge that Mr. Freman received a distribution from his Retirement Account in taxable year 2012. Ms. Freman testified as much, saying that she and Mr. Freman "went down [to Monex] together" to get the distribution. Ms. Freman also signed a notarized spousal consent form, which was part of the Termination/

**[\*15]** Distribution Form, that further evidences her awareness of the transaction.

However, Ms. Freman disputes her knowledge and awareness of the full extent of the transaction. Mr. Freman's Wage and Income Transcript for taxable year 2012 reflects a total distribution amount of $172,342 and withholding tax of $34,468. Conversely, Ms. Freman testified that she "thought [the distribution] was [$]90,000." Ms. Freman continued, stating:

> I knew [the distribution] was [$]90[,000], and [Mr. Freman] had told me that the taxes had been taken out of it. . . . I found out later, if there is — if these are two separate situations, I don't know anything about [$]172,000. But we did take money out. . . . we were told it was $90,000. [Mr. Freman] told me he paid all the taxes on it and there were no taxes due.

We find Ms. Freman's testimony credible. First, Ms. Freman's testimony is, in part, an admission against her own interest. Her testimony is that she knew about the transaction and that, when all was said and done, she and Mr. Freman received $90,000. This testimony is detrimental to her own pecuniary interest and also precludes relief under section 6015(b) for the portion of the understatement for which she had actual knowledge. *See* Treas. Reg. §§ 1.6015-2(c), 1.6015-3(c)(2)(ii). Second, the Termination/Distribution Form, as admitted into evidence, is a partial document. Only pages one, four, and five are present; pages two and three are missing. The form, as submitted into evidence, establishes only that Ms. Freman was aware of the circumstances giving rise to the error on the tax return but does not establish Ms. Freman's knowledge of the exact amount of the distribution.[19] *Cf. Cheshire v. Commissioner*, 115 T.C. 183, 197 (2000)

---

[19] The "Payment Election" selected on page one of the Termination/Distribution Form is "Total Cash Distribution." It is unclear whether this means the total amount of the distribution was made in cash or that a distribution was made in cash for the total amount of the account.

Under the "Payment Election" section, another payment option is "Direct Rollover of Entire Account." The fact that one payment option clearly mentions and references the balance of the account while the "Total Cash Distribution" option lacks such a clear reference leads to ambiguity. Further adding to the ambiguity is the "Signatures and Authorizations" section, which states in part: "I consent to an immediate distribution of the *elected portion* of my Vested Account Balance."

**[\*16]** (holding that the requesting spouse was not entitled to relief when she knew about the full amount of proceeds from a retirement account distribution, and was just unaware of the misstatements on the return), *aff'd*, 282 F.3d 326 (5th Cir. 2002).

We take at face value Ms. Freman's testimony that she had actual knowledge of only part of the amount of the Retirement Account distribution, that "[Mr. Freman] told [her] he paid all the taxes on [the distribution] and there were no taxes due," and that thereafter the couple received $90,000. That is, Ms. Freman had knowledge of the Retirement Account distribution such that, after applicable federal taxes, she and Mr. Freman received $90,000 (hereinafter $90,000 Amount).

b.  *Reason to Know*

The Court must now determine whether Ms. Freman had reason to know of the understatement of tax attributable to any amount above the $90,000 Amount that she actually knew about for taxable year 2012. A requesting spouse has reason to know of an understatement if a reasonable person in similar circumstances would have known of the understatement. Treas. Reg. § 1.6015-2(c). This standard is not abstract, however, as the prudent taxpayer must be placed in Ms. Freman's particular circumstances. *See Resser v. Commissioner*, 74 F.3d 1528, 1536 (7th Cir. 1996), *rev'g and remanding* T.C. Memo. 1994-241.

Ms. Freman had reason to know of the understatement on the taxable year 2012 return if she had constructive knowledge. "Courts have interpreted the reason-to-know element to encompass two separate types of constructive knowledge." *Greer v. Commissioner*, 595 F.3d 338, 345 (6th Cir. 2010), *aff'g* T.C. Memo. 2009-20. A requesting spouse has constructive knowledge if either (1) they know facts sufficient to give him or her reason to know of an understatement reflected on the return, or (2) even if they do not have reason to know of an understatement, the requesting spouse may know facts sufficient to place him or her on notice

---

(Emphasis added.) The reference to an "elected portion" suggests the ability to elect a distribution of a partial amount of the account, yet such an option is not available on any of the pages admitted into evidence.

Ultimately, it is the incomplete nature of the form that gives rise to this ambiguity and affects the weight that this form is afforded in our findings. *See, e.g.*, *Barnes v. Commissioner*, 2004 WL 2650717, at \*8.

**[\*17]** of a possible understatement, giving rise to a duty of inquiry. *Jacobsen*, T.C. Memo. 2018-115, at \*14–15.

All facts and circumstances must be considered when determining whether a requesting spouse had reason to know of an understatement on a return. Treas. Reg. § 1.6015-2(c). Relevant considerations include (but are not limited to) (1) the requesting spouse's level of education; (2) the requesting spouse's involvement in the financial and business activity of the family; (3) the presence of expenditures that appear lavish or unusual when compared with the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit about the family's finances. *Price v. Commissioner*, 887 F.2d 959, 965 (9th Cir. 1989) (citing *Stevens v. Commissioner*, 872 F.2d 1499, 1505 (11th Cir. 1989), *aff'g* T.C. Memo. 1988-63).

Ms. Freman has a high school education, and there is no evidence that she has a business, accounting, or tax background. We have frequently decided this factor in favor of taxpayers who lack education in finance, even if the requesting spouse is otherwise highly educated. *See Wang v. Commissioner*, T.C. Memo. 2014-206, at \*20. Further, Ms. Freman was not involved in managing the family finances, which was solely the domain of Mr. Freman. Both Ms. Freman and Mr. Freman testified that the amounts received from the Retirement Account distribution were used to meet basic household needs, and there is no evidence to conclude that there were any lavish or extravagant expenditures. Finally, Ms. Freman was not in control of the couple's finances, and she had limited knowledge about the topic, such as who was preparing the tax returns.[20]

Even in the light of the foregoing, Ms. Freman still had reason to know of the amount above the $90,000 Amount. Both Ms. Freman and

---

[20] Proposed Treasury Regulation § 1.6015-2(b), 80 Fed. Reg. 72649, 72659 (Nov. 20, 2015), provides that a requesting spouse will be treated as not having knowledge or reason to know if they were subject to abuse or financial control by the nonrequesting spouse and because of such abuse or financial control the requesting spouse was not able to challenge the treatment of any item on the joint return for fear of retaliation by the nonrequesting spouse. The standard under the proposed regulation is similar to the standard applicable under section 6015(f). The standard under section 6015(b), however, is different from current Treasury Regulation § 1.6015-2, which does not provide an exception for financial control. A proposed regulation is given no greater weight than a position advanced by the Commissioner on brief. *See Ordlock v. Commissioner*, 126 T.C. 47, 70 n.6 (2006) (Thornton, J., concurring).

**[*18]** Mr. Freman testified that they had a joint bank account during the tax years at issue. Further, Mr. Freman stated to AO Rassenfoss that the distribution was deposited into the couple's joint bank account. A deposit into a joint bank account is sufficient to establish that Ms. Freman had reason to know of the full amount of the distribution. *See Culver v. Commissioner*, 116 T.C. 189, 197 (2001) (stating that deposits into a joint bank account would indicate that the requesting spouse should have had reason to know of embezzled funds); *Richard v. Commissioner*, T.C. Memo. 2011-144, 2011 WL 2553379, at *3 (stating that circumstantial evidence, such as a deposit in a joint bank account, may indicate that the requesting spouse had reason to know of the retirement account distribution).

Ms. Freman had knowledge or reason to know of the full amount of the distribution and she is ineligible for full or apportioned relief under this section. She had actual knowledge of the $90,000 Amount and reason to know of the remainder of the distribution. Thus, Ms. Freman had knowledge of the distribution under section 6015(b)(1)(C) and cannot qualify for relief under section 6015(b).

C. *Section 6015(c) Relief*

1. *Section 6015(c), Generally*

Ms. Freman seeks relief under section 6015(c) for the understatement of tax for taxable year 2012. To qualify for relief under section 6015(c), the requesting spouse must satisfy all of the following conditions: (1) a joint return was filed for the taxable year; (2) at the time of the election, the requesting spouse was separated or divorced from the nonrequesting spouse or was not a member of the same household as the nonrequesting spouse at any time during the 12 month period ending on the date of the request for relief; and (3) the requesting spouse made a timely election for relief. § 6015(c)(1), (3). However, if the Commissioner demonstrates that, at the time of signing the return, a requesting spouse had actual knowledge of the item giving rise to a deficiency (or a portion thereof), the requesting spouse shall be ineligible for relief under this section for the deficiency (or portion thereof). § 6015(c)(2), (3)(C).

Respondent concedes that Ms. Freman satisfies the joint return requirement under section 6015(c)(1), and he does not dispute that she satisfies the timely election for relief requirement under section 6015(c)(3)(B) because respondent has not begun collection activities for

**[\*19]** the 2012 tax liability. Respondent argues, however, that Ms. Freman does not satisfy the separated, divorced, or living apart requirement under section 6015(c)(3)(A)(i) or the lack of actual knowledge requirement under section 6015(c)(3)(C).

### 2.     *Separated, Divorced, or Living Apart Requirement*

Section 6015(c) provides that an individual is eligible to elect the application of subsection (c) if, at the time the election is filed, the individual is no longer married to, or is legally separated from, the nonrequesting spouse with whom they filed the joint return; or such individual was not a member of the same household as the individual with whom such joint return was filed at any time during the 12 month period ending on the date such election is filed. § 6015(c)(3)(A)(i). We will analyze each of the foregoing in turn.

### a.     *Legally Separated or Divorced*

First, when Ms. Freman filed her election under section 6015(c), she was still married and was not legally separated from Mr. Freman. This determination is made at the time the election for spousal relief is filed and in accordance with section 7703 and the regulations thereunder. Treas. Reg. § 1.6015-3(b)(1). An individual shall not be considered married if they are legally separated from their spouse under a decree of divorce or of separate maintenance. § 7703(a)(2).

California Family Code § 2340 (West 2022) provides: "A judgment of dissolution of marriage shall specify the date on which the judgment becomes finally effective for the purpose of terminating the marriage relationship of the parties." Ms. Freman and Mr. Freman both testified that a judgment of dissolution was entered in or about July 2021, by a court in Riverside County, California. The parties have not submitted a copy of their judgment of dissolution into evidence, and Ms. Freman has not provided any other documentary evidence, such as a judgment of legal separation, to rebut the conclusion that she was still legally married to, and not legally separated from, Mr. Freman when she filed her request for relief on February 21, 2019. Because Ms. Freman was not legally separated or divorced at the time she filed her election for relief, she does not satisfy the requirement of section 6015(c)(3)(A)(i) on that basis.

**[\*20]**                    b.    *Living Apart*

Ms. Freman had not lived separate and apart from Mr. Freman for a period of 12 months on the date that she filed her election for relief. Spouses who reside in the same dwelling are considered members of the same household. Treas. Reg. § 1.6015-3(b)(3)(ii); Rev. Proc. 2013-34, § 4.03(2)(a)(iv), 2013-43 I.R.B. at 400–01. Mr. Freman, on his Form 12508, stated that Ms. Freman moved out of the marital residence "as of March 10, 2018." At trial, Ms. Freman testified that she moved out of the marital residence in "maybe March [or] April" of 2018. Even assuming arguendo that Ms. Freman moved out on March 1, 2018, the earliest date one could reasonably infer, she still would be a few weeks shy of meeting the required 12 month period of living separate and apart from Mr. Freman when she filed her election for relief on February 21, 2019. Because Ms. Freman had not lived separate and apart from Mr. Freman for a period of 12 months when she filed her election for relief, she does not satisfy the requirement of section 6015(c)(3)(A)(i).

We therefore agree with respondent that at the time Ms. Freman filed her election for relief, she was still married and not legally separated from Mr. Freman, and she also had not lived separate and apart from him for a period of 12 months.[21] *See Vetrano v. Commissioner*, 116 T.C. 272, 282–83 (2001), *supplementing* T.C. Memo. 2000-128. We need not complete an analysis of whether Ms. Freman had actual knowledge because she does not meet the separated, divorced, or living apart requirement under section 6015(c)(3)(A)(i). We find that Ms. Freman cannot qualify for relief for the 2012 understatement under section 6015(c).

D.    *Section 6015(f) Relief*

Finally, because Ms. Freman does not qualify for relief under section 6015(b) or (c), she may seek relief under section 6015(f) for the understatement of tax for taxable year 2012. Additionally, she can seek relief only under section 6015(f) for the underpayments of tax for taxable years 2014 and 2015. Section 6015(f) provides relief from joint and several liability if it is inequitable to hold the requesting spouse liable for any unpaid tax or any deficiency (or any portion thereof) after taking

---

[21] Ms. Freman did not file a second election for relief after she had lived separate and apart from Mr. Freman for a period of 12 consecutive months. *See* Treas. Reg. § 1.6015-1(h)(5).

**[\*21]** into account all the facts and circumstances. § 6015(f)(1)(A); *Porter*, 132 T.C. at 206; Treas. Reg. § 1.6015-4(a).

Treasury Regulation § 1.6015-4(c) directs us to Revenue Procedure 2013-34 for relevant guidance.[22] Revenue Procedure 2013-34 sets forth a three-step analysis for evaluating section 6015(f) claims for relief: (1) the requesting spouse must satisfy the seven threshold requirements, Rev. Proc. 2013-34, § 4.01; (2) the requesting spouse must satisfy the three-part test for streamlined relief, *id*. § 4.02, 2013-43 I.R.B. at 400; or (3) if a requesting spouse does not satisfy the test for streamlined relief, the requesting spouse may still qualify for relief from joint and several liability if it would be inequitable to hold them liable in the light of the nonexclusive list of factors outlined in Revenue Procedure 2013-34, § 4.03. Although the Court considers those procedures when reviewing the Commissioner's determination, the Court is not bound by them. *Leith*, T.C. Memo. 2020-149, at \*19.

### 1.    *Threshold Requirements*

The requesting spouse must meet seven threshold requirements to be considered for relief under section 6015(f). Rev. Proc. 2013-34, § 4.01. Those requirements are (a) the requesting spouse filed a joint return for the taxable year for which relief is sought; (b) relief is not available to the requesting spouse under section 6015(b) or (c); (c) the claim for relief is timely filed; (d) no assets were transferred between the spouses as part of a fraudulent scheme; (e) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (f) the requesting spouse did not knowingly participate in the filing of a fraudulent joint return; and (g) absent certain enumerated exceptions, the tax liability from which the requesting spouse seeks relief is attributable to an item of the nonrequesting spouse.[23] Rev. Proc. 2013 34, § 4.01.

Respondent agrees that the threshold conditions are "likely met" for all years at issue. A review of the facts shows that is largely true. First, Ms. Freman and Mr. Freman filed joint returns for the 2012, 2014,

---

[22] Rev. Proc. 2000-15, 2000-1 C.B. 447, *superseded* by Rev. Proc. 2003-61, 2003-2 C.B. 296, *superseded* by Rev. Proc. 2013-34 (IRS RPR), 2013-43 I.R.B. 397.

[23] For the purposes of the analysis under section 6015(f) and Revenue Procedure 2013-34, if any item is attributable or partially attributable to the requesting spouse solely because of the operation of community property laws, then that item or portion thereof will be considered attributable only to the nonrequesting spouse. Rev. Proc. 2013-34, § 4.01(7)(a).

**[\*22]** and 2015 tax years at issue. *See supra* Part III.A. Second, Ms. Freman is not entitled to relief under section 6015(b) or (c) for the tax year 2012 understatement, and she can seek relief for the underpayments for taxable years 2014 and 2015 only under section 6015(f). *See supra* Part III.B and C. Third, Ms. Freman timely filed her claim for relief before the expiration of the 10-year periods of limitation for collection. *See* Rev. Proc. 2013-34, § 4.01(3)(a); *see also* § 6502. Fourth, there are no allegations of asset transfers made pursuant to a fraudulent scheme. Fifth, there are no allegations of any disqualified asset transfers. Sixth, there are no facts to suggest that Ms. Freman knowingly participated in filing a fraudulent joint return. Finally, seventh, the understatement on the tax year 2012 return is solely attributable to Mr. Freman, as are the underpayments of tax reflected as due on the 2014 and 2015 returns. However, the Court notes that Ms. Freman is ineligible for section 6015(f) relief to the extent any of the 2015 underpayment is attributable to her cancellation of indebtedness income that was not included on the return. Thus, Ms. Freman satisfies the threshold requirements for relief, with the lone exception of any liability attributable to her unreported cancellation of indebtedness income for tax year 2015.

### 2. *Streamlined Determination Elements*

Revenue Procedure 2013-34, § 4.02 sets forth circumstances under which the Commissioner will make a streamlined determination granting equitable relief to the requesting spouse. These include that she establishes that she (a) is no longer married to the nonrequesting spouse (marital status requirement), (b) would suffer economic hardship if not granted relief (economic hardship requirement), and (c) did not know or have reason to know that there was an understatement or deficiency on the joint income tax return or did not know or have reason to know that the nonrequesting spouse would not or could not pay the underpayment of tax reported on the joint income tax return (lack of knowledge requirement). *Id.* The requesting spouse must establish that she satisfies each of the three elements to receive a streamlined determination granting relief. *Id.*

### a. *Marital Status Requirement*

This factor is met if the requesting spouse is no longer married to the nonrequesting spouse. *Id.* § 4.02(1). Because Ms. Freman has received a judgment or decree of divorce, this factor favors relief.

[*23]                              b.     *Economic Hardship Requirement*

This factor is met when a failure to grant relief from joint and several liability would cause the requesting spouse to be unable to pay reasonable basic living expenses. *Id*. § 4.02(2), 4.03(2)(b). If denying relief would not cause the requesting spouse economic hardship, this factor is neutral. *Id*. Generally, a requesting spouse would suffer economic hardship if (1) the requesting spouse's income is less than 250% of the federal poverty guidelines,[24] or if her monthly income exceeds her reasonable basic living expenses by $300 or less, and (2) the requesting spouse does not have assets from which the requesting spouse can make payments towards the tax liability and still meet reasonable basic living expenses. *Id*.; *see also Contreras v. Commissioner*, T.C. Memo. 2019-12, at *16–17.

Additionally, if neither of the foregoing tests is met, then the Court will also consider additional factors such as (1) the taxpayer's age and earning potential, (2) an amount reasonably necessary for food, clothing, housing, medical expenses, and transportation, (3) the amount of assets available to pay the taxpayer's expenses, (4) the cost of living in the geographical area in which the taxpayer lives, and (5) any other factors bearing on economic hardship. Rev. Proc. 2013-34, § 4.02(2) (citing *id*. § 4.03(2)(b) ("Whether the requesting spouse will suffer economic hardship is determined based on rules similar to those provided in Treas. Reg. § 301.6343-1(b)(4) . . . .")).

Ms. Freman's Form 8857, dated August 9, 2018, and received by CCISO on February 21, 2019, states that she had a checking account with $300, total monthly income of $1,160, and total monthly expenses of $1,910. At trial Ms. Freman testified that after she left the marital home she moved into a recreational vehicle. She testified that her lessors "took [her] in knowing [her] situation with practically nothing to give them, knowing that [she] would get a job with the school district and be able to pay at that point." Ms. Freman also stated that she was awarded $3,000 a month in spousal and child support and that when she received a fraction of that amount from Mr. Freman, the lessors were "very gracious to [her] and to [her] daughter and let [her] stay there just on

---

[24] *See* 42 U.S.C. § 9902(2). The Department of Health and Human Services poverty guidelines for 2022 provide that a household with two persons in the contiguous 48 states has a poverty threshold of $18,310. Annual Update of the HHS Poverty Guidelines, 87 Fed. Reg. 3315, 3316 (Jan. 21, 2022). Thus, 250% of this threshold is $45,775.

**[\*24]** that little bit that [Mr. Freman] had given [her] until [she became] employed [in 2018]."

This Court is tasked with evaluating Ms. Freman's economic position at the time of trial on April 5, 2022. *Pullins v. Commissioner*, 136 T.C. 432, 446–47 (2011). A hypothetical hardship is insufficient to justify relief, and a taxpayer must demonstrate that imposing joint and several liability is "inequitable in present terms." *Id.* at 446 (emphasis added) (quoting *Von Kalinowski v. Commissioner*, T.C. Memo. 2001-21, 2001 WL 77034, at \*8). Ms. Freman is in her mid-50's, has a high school education, and supports herself and her minor child. Ms. Freman was not employed outside of the home during the tax years at issue; and on the limited record before the Court, it appears to the Court that she is currently working part time, but she may be pursuing some form of disability assistance. Ms. Freman's Wage and Income Transcript for taxable year 2020, the most recent evidence available to the Court, shows that she received $9,737 of wages, tips, and other compensation, and $13,366 of unemployment compensation. These facts favor a finding of economic hardship. *See, e.g.*, *Contreras*, T.C. Memo. 2019-12, at \*17–18.

However, the Court has nothing more than a historic snapshot of Ms. Freman's financial situation and brief testimony about her prior living arrangements. Ms. Freman testified that she "pay[s] [her] bills when [they're] due" but otherwise did not provide any testimony or present any other evidence detailing her current income, living expenses, assets, or debts. Neither did she provide evidence, if any is available, of any spousal or child support amounts she receives from Mr. Freman, whether she is still receiving government assistance, or what she could reasonably expect to receive from the division of marital assets. *See Wang*, T.C. Memo. 2014-206, at \*38.

At most Ms. Freman has advanced an argument for a hypothetical hardship. *See Henson v. Commissioner*, T.C. Memo. 2012-288, at \*17–19; *see also Mencias v. Commissioner*, T.C. Memo. 2017-109, at \*12. Ms. Freman has the burden of proof, and she has not met that burden because she did not provide any testimony or documentary evidence to substantiate her claim of economic hardship. *See* Rule 142(a). Accordingly, we must treat this factor as neutral.

Because Ms. Freman fails to meet the economic hardship requirement, she is ineligible for streamlined relief. We now proceed to the full equitable relief analysis.

**[*25]**      3.      *Full Equitable Relief Analysis*

Under the full equitable relief analysis of section 6015(f), the Court will consider the following factors: (a) current marital status; (b) whether the requesting spouse would suffer economic hardship if relief were not granted; (c) in understatement cases, whether the requesting spouse knew or had reason to know of the understatement, or in underpayment cases, whether the requesting spouse knew or had reason to know that the nonrequesting spouse would not or could not pay the tax liability, and in either case, the effect of any spousal abuse or financial control; (d) whether either spouse has a legal obligation to pay the outstanding federal income tax liability; (e) whether the requesting spouse significantly benefited from the understatement or underpayment; (f) whether the requesting spouse has made a good faith effort to comply with the income tax laws in the years following the tax years for which relief is sought, and (g) whether the requesting spouse was in poor mental or physical health at the time the joint return was filed. Rev. Proc. 2013-34, § 4.03(2).

a.      *Marital Status Factor*

As discussed *supra* Part III.D.2.a., Ms. Freman is divorced from Mr. Freman. Accordingly, this factor weighs in favor of relief.

b.      *Economic Hardship Factor*

This factor weighs in favor of relief when a failure to grant relief from joint and several liability would cause the requesting spouse to be unable to pay reasonable basic living expenses. *Id.* § 4.03(2)(b). If denying relief would not cause the requesting spouse economic hardship, this factor is neutral. *Id.* As discussed *supra* Part III.D.2.b., Ms. Freman has not presented sufficient evidence to prove her claim of economic hardship. Accordingly, this factor is neutral.

c.      *Lack of Knowledge Factor*

The standard for the lack of knowledge element is different with regard to an understatement of tax, such as the one for taxable year 2012, and an underpayment of tax, such as those for taxable years 2014 and 2015. However, in both cases, knowledge may be mitigated in certain circumstances where there is abuse or financial control by the nonrequesting spouse. *See* Rev. Proc. 2013-34, § 4.03(2)(c)(i) and (ii).

**[*26]**                                        i.        *Understatement Case*

With regard to the understatement of tax for taxable year 2012, the analysis is similar to the discussion for the lack of knowledge factor under section 6015(b). *See supra* Part III.B.2. This factor weighs in favor of relief if the requesting spouse did not know or have reason to know of the item giving rise to the understatement as of the date the joint return was filed. Rev. Proc. 2013-34, § 4.03(2)(c)(i)(A). This factor weighs against relief if the requesting spouse knew or had reason to know of the item giving rise to the understatement as of the date the joint return was filed. *Id.*

As discussed above, Ms. Freman had actual knowledge of the $90,000 Amount of the understatement for taxable year 2012, and reason to know of any amounts above the $90,000 Amount. However, this analysis is subject to our analysis regarding abuse and financial control. *See infra* Part III.D.3.c.iii.

ii.        *Underpayment Case*

With regard to the underpayments of tax for taxable years 2014 and 2015, this factor weighs in favor of relief if the requesting spouse reasonably expected the nonrequesting spouse to pay the tax liability reported on the return. Rev. Proc. 2013-34, § 4.03(2)(c)(ii). This factor weighs against relief if it was not reasonable for the requesting spouse to believe that the nonrequesting spouse would or could pay the tax liability reported on the return. *Id.*

Specifically, the requesting spouse must establish that (1) when they signed the return they did not know and had no reason to know that the tax reported on the return would not be paid, and (2) it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the tax shown due. Rev. Proc. 2013-34, § 4.03(2)(c)(ii); *see Morello v. Commissioner*, T.C. Memo. 2004-181, 2004 WL 1765148, at *4.

At the time Mr. Freman filed the joint tax returns for taxable years 2014 and 2015, Ms. Freman had reason to know that the tax reported on the returns would not be paid, and it was not reasonable to believe that Mr. Freman would pay the amounts shown as due. Ms. Freman testified that after Mr. Freman assumed control of the finances the couple had "electricity being shut off, health insurance being shut off, water being shut off, et cetera, et cetera, because [Mr. Freman] would not let [her] pay the bills." Further, when asked whether she

**[\*27]** thought that "Mr. Freman was not paying the taxes on time," Ms. Freman replied that "[Mr. Freman] would tell me he would get an extension, but at that point, I'm like, okay, whatever that means, however long it's for. But I never knew if he went back and did it or not."

It is clear from the facts that Ms. Freman knew that Mr. Freman made a habit of not paying the bills on time. In the light of these circumstances, Ms. Freman should have been on notice that Mr. Freman would not or could not pay the tax due for taxable years 2014 and 2015. *See Pullins*, 136 T.C. at 444–45. However, this analysis is still subject to our analysis regarding abuse and financial control.[25] *See infra* Part III.D.3.c.iii.

### iii.  *Abuse and Financial Control*

Notwithstanding the foregoing analysis regarding Ms. Freman's knowledge or reason to know of the understatement of tax for taxable year 2012, and the underpayments of tax for taxable years 2014 and 2015, both analyses are subject to an exception. Knowledge may be negated if the nonrequesting spouse abused the requesting spouse or maintained control of the household finances by restricting the requesting spouse's access to financial information such that the nonrequesting spouse's actions prevented the requesting spouse from questioning or challenging the understatement on the return or the underpayment of the liability. Rev. Proc. 2013-34, § 4.02(3)(a), 4.03(2)(c)(i) and (ii).

### a)  *Abuse*

Ms. Freman alleges that she was a victim of abuse during the tax years at issue. "Abuse comes in many forms and can include physical, psychological, sexual, or emotional abuse, including efforts to control, isolate, humiliate, and intimidate the requesting spouse, or to undermine the requesting spouse's ability to reason independently and be able to do what is required under the tax laws." *Id.* § 4.03(2)(c)(iv);

---

[25] The analysis under section 6015(f) is subject to an exception for both abuse and financial control. *See* Rev. Proc. 2013-34, § 4.02(3)(a), 4.03(2)(c)(i) and (ii). In contrast, the analysis under section 6015(b) is subject to an exception only for abuse but not financial control. *See* Treas. Reg. §§ 1.6015-2(c), 1.6015-3(c)(2)(ii). Proposed Treasury Regulation § 1.6015-2(b) would, however, subject the section 6015(b) analysis to an analysis for financial control, but the proposed regulation has not been finalized and thus is given no greater weight than a position advanced by the Commissioner on brief. *See Ordlock*, 126 T.C. at 70 n.6 (Thornton, J., concurring); *see supra* note 20.

**[\*28]** *see, e.g.*, *Leith*, T.C. Memo. 2020-149, at \*27. This Court takes all facts and circumstances into account in determining the presence of abuse, and requires substantiation, or at a minimum, specificity, with regard to allegations of abuse. Rev. Prov. 2013-34, § 4.01; *see Nihiser v. Commissioner*, T.C. Memo. 2008-135, 2008 WL 2120983, at \*10–11; *see also Deihl v. Commissioner*, 603 F. App'x 527, 529 n.4 (9th Cir. 2015), *aff'g* T.C. Memo. 2012-176. A generalized claim of abuse is insufficient. *See Thomassen v. Commissioner*, T.C. Memo. 2011-88, 2011 WL 1518446, at \*11–12, *aff'd*, 564 F. App'x 885 (9th Cir. 2014).

In addition to the statements on her Form 8857, Ms. Freman made two brief statements at trial about her alleged abuse. First, Ms. Freman stated: "I started off paying the bills of the household. But when I would pay the bills and he would see the account would get lower, he would get angry. And at that point, that's when he took the bills from me and said he would be handling all the financial situations." Second, Ms. Freman stated: "[I]f I said anything [about the finances], he would get angry with me, yell at me, cuss at me, telling me — tell me he had it handled, that he would take care of it." Ms. Freman did not, however, provide a more detailed account of abuse to corroborate her Form 8857, and nearly the full extent of Ms. Freman's statements on the topic of abuse is reproduced above.

These statements lack the requisite specificity and corroborating evidence for Ms. Freman to meet her burden of proof. *See Nihiser v. Commissioner*, 2008 WL 2120983, at \*10–11. We find Ms. Freman's statements credible, and while we do not doubt their sincerity, standing alone they are too generalized to support a finding of spousal abuse. *See Thomassen v. Commissioner*, 2011 WL 1518446, at \*11; *Knorr v. Commissioner*, T.C. Memo. 2004-212, 2004 WL 2094759, at \*7.

b)      *Financial Control*

Ms. Freman alleges that Mr. Freman was solely in control of all financial matters during the tax years at issue. While Ms. Freman's above statements are too generalized to support a finding of abuse, her statements are not made in isolation. The Court must take all facts and circumstances into account, and Ms. Freman's statements are part of a broader context wherein Mr. Freman was the sole source of income in the household, was solely responsible for overseeing the preparation of the tax returns, and assumed control of and solely managed the finances.

**[\*29]** The Court finds Ms. Freman's statements credible, sincere, and candid. Ms. Freman has a high school education, was not versed in matters of finance, and was responsible for taking care of the couple's child during the tax years at issue. Ms. Freman was not involved with managing the finances because Mr. Freman took that responsibility from her and thereafter maintained full control of all financial matters. On cross-examination Ms. Freman questioned Mr. Freman about her having to ask permission to buy groceries and Mr. Freman responded: "I don't recall." The Court does not find Mr. Freman's testimony credible, especially given the fact that he responded with some variation of "I don't recall" to many of Ms. Freman's questions about his handling of the finances.

Further, Ms. Freman did not participate in the preparation of the tax returns and did not know who was preparing them during the tax years at issue. Ms. Freman was not presented with a meaningful opportunity to review the returns for the tax years at issue; and when she asked to see the returns Mr. Freman told her "there was no time," that he "had to get [the returns] in the mail," and that "the IRS was going to be garnishing his wages, and to just sign it so he could leave." When Ms. Freman asked Mr. Freman about this at trial he once again responded: "I don't recall."

Even after Mr. Freman assumed control of the couple's finances, Ms. Freman still made reasonable efforts to inquire about them. For example, Mr. Freman represented to his family that he claimed 99 dependents on their tax returns. Ms. Freman asked Mr. Freman to stop doing this, and in response Mr. Freman got "angry with [Ms. Freman], yell[ed] at [her], cuss[ed] at [her]," and told her that "he had it handled, that he would take care of it."

In the light of all the facts and circumstances, we find that Ms. Freman's knowledge is partially negated by Mr. Freman's financial control. *See Robinson v. Commissioner*, T.C. Memo. 2020-134, at \*28–29 (finding requesting spouse entitled to relief because of nonrequesting spouse's financial control); *Molinet v. Commissioner*, T.C. Memo. 2014-109, at \*12 (finding requesting spouse entitled to relief because of nonrequesting spouse's financial control); *Waldron v. Commissioner*, T.C. Memo. 2011-288, 2011 WL 6259685, at \*4–5 (finding requesting spouse entitled to partial relief from liability); *Bruen v. Commissioner*, T.C. Memo. 2009-249, 2009 WL 3617592, at \*8–9 (finding requesting spouse entitled to partial relief from liability).

**[\*30]** Regarding the understatement of tax for taxable year 2012, we find that this factor weighs against relief for the $90,000 Amount because Mr. Freman's financial control does not negate Ms. Freman's actual knowledge and clear awareness of that portion of the Retirement Account distribution. However, we find that this factor weighs in favor of relief for the amount of the distribution above the $90,000 Amount and negates Ms. Freman's reason to know of that portion of the understatement for taxable year 2012 because Mr. Freman assumed and sustained sole control of the finances; excluded Ms. Freman from involvement; rebuffed her attempts to be involved except when he was obligated to involve her; and misled Ms. Freman about the full extent of the distribution transaction.

Regarding the underpayments of tax for taxable years 2014 and 2015, we find that this factor weighs in favor of relief and negates Ms. Freman's knowledge of Mr. Freman's inability to pay the amounts due because Mr. Freman assumed and sustained control over all financial matters; Mr. Freman did not give Ms. Freman an opportunity to review the returns at issue and she did not know the amounts due; Mr. Freman was not forthcoming and "got angry" when Ms. Freman tried to inquire about financial matters; and Mr. Freman otherwise excluded Ms. Freman from the finances, saying that he "had it handled."[26]

### d. *Legal Obligation Factor*

This factor weighs in favor of relief when the nonrequesting spouse, through a divorce decree or other legally binding agreement, bears the sole legal obligation to pay the outstanding liability. Rev. Proc. 2013-34, § 4.03(2)(d). This factor weighs against relief if the requesting spouse has the legal obligation to pay, and it is neutral if the divorce decree is silent as to tax liabilities or the spouses are not separated. *Id.* Because Ms. Freman has failed to provide this Court with any documentation or other evidence regarding her legal obligation to pay, or lack thereof, this factor is neutral.

---

[26] Although Ms. Freman's access to the joint bank account renders her ineligible for relief under section 6015(b), *see supra* Part III.B.2.a., there is a different standard for relief under section 6015(f), *see supra* note 20. Under section 6015(f) we consider the existence and effects of abuse and financial control. Applying this standard, we find that even though Ms. Freman and Mr. Freman maintained a joint bank account, Mr. Freman still exercised the requisite level of financial control over Ms. Freman. Thus, she is entitled to partial relief.

**[\*31]**                               e.        *No Significant Benefit Factor*

This factor weighs in favor of relief if the requesting spouse did not receive a significant benefit, that is, a benefit in excess of normal support, due to the understatement or underpayment of tax. *Soler*, T.C. Memo. 2022-78, at \*12–13 (citing *Butner v. Commissioner*, T.C. Memo. 2007-136); Rev. Proc. 2013-34, § 4.03(2)(e). This factor weighs against relief if the requesting spouse received a significant benefit due to the understatement or underpayment of tax. Rev. Proc. 2013-34, § 4.03(2)(e). There is no testimony nor any fact in the record that suggests that Ms. Freman enjoyed a lavish lifestyle as a result of the understatement or underpayments at issue. To the contrary, both Ms. Freman and Mr. Freman testified that the proceeds from the distribution were used for household bills and living expenses. Accordingly, this factor weighs in favor of relief.

f.        *Compliance Factor*

This factor weighs in favor of relief if the requesting spouse is in compliance with the tax laws for the tax years after being divorced from the nonrequesting spouse. *Id*. § 4.03(2)(f)(i). This factor weighs against relief if the requesting spouse is not in compliance for the tax years after being divorced from the nonrequesting spouse. *Id*. This factor is neutral if the requesting spouse has made a good faith effort to comply with the tax laws but was unable to fully comply. *Id*.

Ms. Freman filed for divorce from Mr. Freman sometime in November 2017, moved out of the marital residence in either March or April of 2018, and received a judgment of dissolution sometime in or about July 2021. The Court lacks sufficient information to determine Ms. Freman's compliance for the one taxable year after her divorce, taxable year 2021. The jointly submitted First Stipulation of Facts was submitted to the Court on April 4, 2022, and it does not contain any information about Ms. Freman's return for taxable year 2021. At trial on April 5, 2022, Ms. Freman stated that she still had to file her 2021 tax return. The filing deadline for taxable year 2021 returns was not until April 18, 2022, and thus the absence of this information is neutral. *See* §§ 6072(a), 7503; I.R.S. News Release IR-2022-08 (Jan. 10, 2022).[27]

---

[27] *See* § 6072(a) (providing that a person required to make a return of income under section 6012 shall file such return on April 15); § 7503 (providing that under the Code, where the day prescribed to perform an act falls on a legal holiday in the District

**[\*32]** For the years before she received a judgment of dissolution, Ms. Freman has shown a good faith effort to comply with the income tax laws. Ms. Freman did not file a return for taxable year 2018 although the record does not contain enough evidence to determine whether Ms. Freman had a filing requirement. Ms. Freman did, however, file tax returns for taxable years 2019 and 2020 and stated at trial that "I have filed my taxes on time by myself and paid what needs to be paid or gotten back what was allotted to me." Ms. Freman's actual returns for taxable years 2019 and 2020 are not in evidence, but her Account Transcripts show that she timely filed her returns for both years and that she was issued refunds. Ms. Freman has at least made a good faith effort to comply with the federal tax laws in the years after she filed for divorce although her level of compliance has not been perfect. *See Hudgins v. Commissioner*, T.C. Memo. 2012-260, 2012 WL 3964890, at \*37–38. These facts also support treating this factor as neutral.

g. *Mental or Physical Health Factor*

This factor weighs in favor of relief if the requesting spouse was in poor physical or mental health at the time the returns from which she seeks relief were filed, or at the time she requested relief. Rev. Proc. 2013-34, § 4.03(2)(g). If the requesting spouse was in neither poor mental nor physical health, this factor is neutral. *Id.*

Ms. Freman testified that she was hospitalized for a time in 2015 and that she was subsequently prescribed narcotics to help her with pain management. However, the scope of her health problems and the exact timeline of any events remain unclear. Ms. Freman did not offer any detailed testimony, documentary evidence, or witnesses to explain the full scope of her health problems. Accordingly, this factor must be treated as neutral.

4. *Conclusion*

After weighing all the facts and circumstances, we find that Ms. Freman is entitled to partial relief under section 6015(f). We find that it

---

of Columbia, the act shall be performed the next succeeding day that is not a Saturday, Sunday, or legal holiday); D.C. Code Ann. § 28-2701 (West 2022) (District of Columbia Emancipation Day fell on Saturday, April 16, 2022; the holiday was observed on the next preceding date); Treas. Reg. § 301.7503-1(b) (citing D.C. Code Ann. § 28-2701). In calendar year 2022, District of Columbia Emancipation Day fell on Saturday, April 16, 2022. Accordingly, the holiday was observed on Friday, April 15, 2022, and the filing deadline fell on the succeeding Monday, April 18, 2022.

**[*33]** is not inequitable to hold Ms. Freman liable for tax on the $90,000 Amount for taxable year 2012 because she had actual and clear awareness of that amount. However, we find that it is inequitable to hold Ms. Freman liable for tax on any amounts above the $90,000 Amount for the taxable year 2012 understatement, and for the underpayments for taxable years 2014 and 2015.[28] This is because Mr. Freman's financial control negated Ms. Freman's reason to know of the amounts of the distribution above the $90,000 Amount and her knowledge of Mr. Freman's inability to pay, among other factors that weigh in favor of relief.

The Court has considered all the other contentions of the parties and, to the extent not discussed above, finds those arguments to be irrelevant, moot, or without merit.

*Decision will be entered under Rule 155.*

---

[28] For taxable year 2015, Ms. Freman is, however, ineligible for relief to the extent any of the 2015 underpayment is attributable to her cancellation of indebtedness income.